GARRIETTA LATOYA VEREEN,

    Plaintiff,

       v.                    Case No.3:10-cv-1174-J-12JBT

LOU SOBH AUTOMOTIVE OF
JAX, INC., etc.,

    Defendant.

---

## O R D E R

    This cause is before the Court on 1) Defendant's Amended Motion for Final Summary Judgment (Doc. 29); 2) Plaintiff's response in opposition (Doc. 36); 3) Plaintiff's Motion for Partial Summary Judgment (Doc. 41); and 4) Defendant's response in opposition (Doc. 46). On November 9, 2011, the Court heard oral argument on the motions for summary judgment. On January 26, 2012, Plaintiff filed a Notice of Supplemental Authority (Doc. 55) and on February 21, 2012, an Amended Notice of Supplemental Authority (Doc. 57).[1]

    Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The purpose of summary judgment is to

---

[1]     Plaintiff's Amended Notice of Supplemental Authority (Doc. 57) replaces a Notice of Supplemental Authority (Doc. 56) filed February 16, 2012.

dispose of unsupported claims or defenses which, as a matter of law, do not raise issues of material fact suitable for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In determining whether the movant is entitled to summary judgment, the Court must view all the evidence and factual inferences reasonably drawn from the evidence in the light most favorable to the non-moving party, and must resolve all reasonable doubts in favor of the non-movant. See, e.g., Rioux v. City of Atlanta, Georgia, 520 F.3d 1269, 1274 (11th Cir. 2008)(citations omitted).

The Court will grant summary judgment in favor of Defendant as to all of Plaintiff's claims except her claim under the Florida Deceptive and Unfair Trade Practices Act, and deny Plaintiff's motion for partial summary judgment, for the reasons set forth below. The Court first will discuss generally the nature of Plaintiff's claims, then will review the evidence in the record, identifying relevant undisputed and disputed facts, and finally will discuss the viability of her claims under applicable law.

### Plaintiff's Claims

Plaintiff's Amended Complaint (Doc. 26) asserts various causes of action arising from her attempt to buy a used car from Defendant in March 2010. She seeks in excess of $100,000 in statutory and other damages, as well as declaratory and injunctive relief. Doc. 26 at ¶ 1.

The transaction in question involved what is known as a conditional sale/spot delivery whereby a buyer pays a deposit and takes immediate delivery of the vehicle subject to the seller's ability to obtain financing from a third party. In conjunction with her attempt to purchase a vehicle from Defendant, Plaintiff executed numerous documents, including 1) a Retail Installment Sales Contract ("RISC") (Doc. 29-1, pp. 5-11) containing

disclosures required by the Truth in Lending Act ("TILA") regarding the proposed terms of the financing for the vehicle naming Defendant as the "Seller-Creditor" and containing a merger clause; and 2) a Bailment Agreement for Vehicle Spot Delivery ("Bailment Agreement") (Doc. 29-1, pp. 15 and 16)[2] transferring possession of the vehicle to Plaintiff until financing was finalized under the agreed terms.

Plaintiff maintains that in her case, and as a general practice, at the time of the conditional sale/spot delivery, Defendant has no intention of offering or obtaining credit on the terms disclosed in the initial RISC. She claims that Defendant's practice is to "bait" customers by offering agreeable initial financing terms disclosed in the initial RISC, then rescind the RISC pursuant to the Bailment Agreement claiming inability to obtain financing on the terms disclosed therein so as to "switch" the financing terms to ones more favorable to it after the buyer is out of the car-buying market, has taken possession of the vehicle, and has come to rely upon it.

Plaintiff asserts that Defendant informed her financing could not be obtained under the terms in the original RISC and proposed new, less favorable terms. When she refused to renegotiate the terms of the sale, Defendant then repossessed the vehicle causing her to incur various transportation costs, kept her trade-in vehicle for which she was to be given a $1000 allowance, and did not return her $1000 cash deposit.

Plaintiff asserts that Defendant's spot delivery/conditional sales practices (in general and in her case specifically) violate state and federal law because the required financial

---

[2]    Plaintiff executed two documents: one entitled Bailment Agreement, and the other Bailment Agreement for Vehicle Spot Delivery. The documents utilize somewhat different language in their similar terms. The Court will refer to a single Bailment Agreement and distinguish any relevant terms which are not similar as necessary.

disclosures are rendered incomplete, meaningless and illusory due to Defendant's lack of intent to provide financing at the stated terms of the original RISC when it is signed by the buyer, and the fact that the Bailment Agreement gives Defendant the unilateral ability to revoke those terms and require a buyer to accept less favorable financing terms or be required to return the vehicle. She also maintains that the Bailment Agreement utilized by Defendant allows it to disclaim it's status as a creditor, as it is so identified in the RISC, because the buyer accepts delivery of the vehicle subject to Defendant's ability to obtain financing from a third party, thereby relieving Defendant of the requirement of notifying the buyer in writing of the reasons it revoked the RISC. Plaintiff claims that such practices violate the Truth in Lending Act ("TILA")(Count I), the Florida Motor Vehicle Retail Sales Finance Act (MVRSFA)(Counts II and III), the Equal Credit Opportunity Act ("ECOA") (Count IV), the Florida Uniform Commercial Code ("UCC") (Count V), the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")(Count VI) and that two Florida statutes purporting to all allow such conditional sales/spot delivery violate the U.S. Constitution (Count VII).[3]

Plaintiff's position essentially is that the practice of conditional sale/spot delivery utilizing a RISC and a Bailment Agreement as part of the same transaction improperly allows the car dealer to unilaterally rescind the RISC financing terms originally disclosed and to require the customer to return the vehicle or accept less favorable financing terms.

---

[3]     On November 21, 2011, Plaintiff's Notice of Mailing Florida Attorney General With [sic] Notice of Constitutional Question (Doc. 52), pursuant to Fed.R.Civ. P. 5.1, was filed. On December 1, 2011, pursuant to that same rule, the Court entered a Certification of Constitutional Question (Doc. 53), noting that Defendant's request for summary judgment raising the constitutional question was under advisement, and directing the Clerk to provide a copy to the Florida Attorney General. As of the date of this Order, the Florida Attorney General has not sought to intervene or otherwise filed anything with the Court with regard to the constitutional question raised in this case.

4

She asserts Defendant utilizes conditional sale/spot delivery in order to make a sale with an agreeable initial financing proposal but with no intent to finance or obtain financing on those terms. As a result, she claims Defendant violates or avoids compliance with federal and state laws, such as the TILA, applicable to creditors and credit transactions.

The Court has reviewed the entire record before it, as well as numerous cases cited by the parties. Much of Plaintiff's characterization of her transaction with Defendant, as well as her claims regarding it's general practices as described in her Amended Complaint, are not supported by the factual record before the Court. For the reasons set forth below, the Court finds that the relevant undisputed facts, and the applicable case law, cannot support a finding that Defendant violated the federal and state laws set forth in Plaintiff's Amended Complaint in Counts I through V (TILA, FMVRSFA, ECOA, and UCC) and Count VII (U.S. Constitutional violation) and summary judgment on those counts is due to be entered for Defendant. The Court also finds that questions of fact preclude summary judgment with regard to Count VI (FDUTPA).

## Evidence in the Record

The Court describes in some detail below the uncontested and contested facts established in the record before the Court. Plaintiff's own testimony is significant.

Plaintiff testified in her deposition (Doc. 29-1, pp. 20-49)[4] that she first went to Defendant's car dealership in March 2010 to purchase a car, and a Mr. Holloway was the salesperson with whom she dealt (p. 22). During that first visit, she filled out paperwork

---

[4]    Doc. 29-1 is comprised of numerous documents. Plaintiff's entire deposition is found at pp. 20-49, with each of those pages containing four (4) pages of her deposition. References to page numbers of Plaintiff's deposition are to page numbers of the deposition, not the page number of the Court's document.

to permit Defendant to check her credit (p. 24). She understood that the transaction was contingent upon a third party financial institution providing financing, that she had to be approved for financing, and that any payments would be made to that institution, not to the Defendant (pp. 24-27, 29, 69). She also provided some documentation regarding her income (p. 30). The following day she returned and provided additional documentation about her income (p. 34).

Two days later, Defendant contacted her to advise that if she had her deposit, she could "finish the transaction for the car (pp. 37-38)." She returned to Defendant's dealership that day, and signed additional documents (p. 37).

At that time, she claims that Defendant's Financial Manager Doug Sayre (Sayre) told her that the lender for the transaction would be MarkOne (p. 38). Sayre then printed out various documents which she signed at his direction (pp. 38-39). She claims that he did not go over the various terms of the documents with her, only the price, and she signed all the papers because she wanted a car (p. 73-74). She acknowledged that she had the opportunity to read the documents and ask questions if she had wanted to (p. 39-41,47-48, 51), but "[o]nce you look at the numbers, there's no question." She paid her deposit, agreed to the disclosed monthly payment of $265.10, and stated that when she drove away Sayre told her that the car was hers, as long as she made her payments to MarkOne (p. 41-42).

She states she understood she would not be making payments to Defendant (p. 42). At the time she left the dealership, she believed she had been approved for financing, the transaction was final, and she would be making the agreed monthly payments to MarkOne in order to keep the car (p. 53 and 76).

6

She relays that a few days after she got the car, Mr. Holloway called her to ask how the car was running, then the following day called again to ask if she could provide a bank statement to verify some of her income, which she claims she did (p. 58-59). Mr. Holloway then called to ask if she had a co-buyer, and when she said she did not, asked her to return to the dealership to sign another contract, but she refused because she was happy with the contract they had agreed to and she had signed (p. 59-60).

Several days later she spoke with Sayre who told her he had found another lender, but the price (monthly payment) would be higher, by almost $100 each month (p. 60 and 84). She told Sayre she could not afford a higher payment and he asked her to come back to the dealership (p. 60). She agreed but never went back because she was hospitalized the next day. The car was repossessed while she was in the hospital and she never recovered her trade-in or deposit (pp. 81-82).

Plaintiff's deposition testimony establishes several important factual matters. First, it is clear that from the first time she visited Defendant's dealership, she knew Defendant would not be providing the financing for the transaction. Plaintiff understood that MarkOne was to be the lender or creditor providing financing for the purchase, and any payments would be made to MarkOne. Next, she knew verification of her income was part of the transaction. Finally, she believed, based on what she says Sayre told her, that when she took possession of the car, she had been approved for financing, the transaction was final, and her only remaining obligation was to make her payments on time to MarkOne.

Plaintiff's testimony establishes without question that she understood that Defendant was not acting as a lender or creditor for the transaction, but as an agent or broker to procure financing from a third party who required verification of income. Her testimony also

suggests that she did not understand that under the Baliment Agreement, the transaction was a conditional sale/spot delivery, meaning she was not yet the owner of the vehicle because the transaction was conditioned upon final approval of her credit by MarkOne under the terms disclosed in the RISC.

The Court now discusses the evidence related to Defendant's view of the transaction. Defendant's Finance Manager at the time, Sayre, asserts in an affidavit that the transaction with Plaintiff was conditioned upon the approval of financing by MarkOne and that when MarkOne could not complete the financing with the information it had, Plaintiff's cooperation was needed but she refused. Doc. 29-1 at 51.

In his deposition (Doc. 29-1, 57-84),[5] Sayre asserts that Defendant was neither a creditor nor a lender (p.7). He testified that the RISC is a contract used by virtually all car dealers in the state and the term Seller-Creditor used in the form permits it to be used by those dealers that self-finance, the so-called "buy here/pay here" car dealers, as well as by those that rely on third party financing (pp. 8-9, 70). In the transaction with Plaintiff, he explained the term Seller-Creditor in the RISC as referring to the fact that Plaintiff either would pay Defendant as Seller the full price of the vehicle in cash or she would pay MarkOne as Creditor according to the financing terms (p. 16-17).

Defendant submitted a proposal for financing to MarkOne based upon the amount of income Plaintiff reported in her Credit Application and MarkOne tentatively approved the financing based on that reported income (p. 19). It is Defendant's practice to run a credit

---

[5]     Doc. 29-1 is comprised of numerous documents.  Sayre's entire deposition is found at pp. 57-84, with each of those pages containing four (4) pages of his deposition.  References to page numbers of Sayre's deposition are to the page numbers of the deposition, not page numbers of the Court's document.

report for any customer seeking financing to purchase a vehicle to determine what kind of lender might approve financing (p. 49). The potential third-party lender also reviews the potential customer's credit report based upon the information received from the potential seller and makes the final decision whether or not to extend credit (p. 53, 66-67). Sayre testified that Defendant did not make the final decision not to extend credit to Plaintiff on the terms set forth in the RISC(p. 66-67).

Sayre testified that spot delivery or conditional sales are common in the industry and used by Defendant because otherwise it would lose business to other dealerships that would utilize that practice (p. 55, 60). He stated the transaction with Plaintiff was such a spot delivery/conditional sale contingent upon approval of financing by a third party creditor (p. 59).

Sayre claims that he prepared all the documents involved in the transaction with Plaintiff, reviewed each one with her, and explained what they meant (p. 11). He explained to her that he was not a loan officer able to approve the loan (pp. 70-71). He maintains she had the opportunity to read and review each document and to ask questions, and that the conditions contained in the documents were fairly revealed to Plaintiff and she agreed to them (pp. 58, 71).

Sayre explained that in general, if the transaction cannot be completed under the proposed terms, the RISC will not be assigned and the deal is rescinded pursuant to the Bailment Agreement (p. 21). The consumer then has the option to return the car or attempt to finance under different terms and/or with a different third party creditor (p. 31, 34).

9

Sayre testified that MarkOne needed additional documentation from Plaintiff to give final approval for her financing, and that Plaintiff was difficult to contact and not very cooperative in supplying the needed documentation (p. 31-32, 35). See also Declaration of Walter E. Riehemann, Doc. 29-1, pp. 17-18. The additional documentation was needed to support the amount of income claimed on her Credit Application (p. 61). When MarkOne declined to provide financing on the basis of the information it had, Sayre sought and found another lender who gave tentative agreement to extend financing for the transaction, but at different terms, including a higher monthly payment (p. 61-62). Sayre testified that the transaction would have been completed under the terms of the original RISC if Plaintiff had supplied documentation to support the amount of income she declared in her Credit Application upon which those original financing terms were based (p. 63-64).

In his deposition (Doc. 46-2 , pp. 2-36),[6] MarkOne's corporate representative, Bruce E. Newmark ("Newmark"), explained that MarkOne is an indirect lender that receives assignments of conditional sales contracts from car dealers and then works with the customer after assignment to process payments (p. 10). After it declined to finance the transaction under the terms in the original RISC, it sent Plaintiff an Adverse Action Notice, which indicated that conditional approval was given for the transaction with modified terms (increased monthly payment) and receipt of additional information (particularly regarding income) (pp. 29, 39-42 , Doc. 46-2 at 47).

---

[6] Doc. 46-2 is comprised of numerous documents. Newmark's entire deposition is found at pp. 2-36, with each of those pages containing four (4) pages of his deposition. References to page numbers of Newmark's deposition are to the page numbers of the deposition, not page numbers of the Court's document.

Sayre states that when Plaintiff did not return to the dealership after indicating she would do so, Defendant repossessed the car (p. 36). He was not aware whether her trade-in or $1000 deposit had been returned to her, that those were decisions to be made by the dealership's General Manager (p. 37-38, 42). Sayre testified that the car was repossessed under the terms of the Bailment Agreement when the financing could not be obtained and Plaintiff refused to cooperate further, not because it had agreed to finance the transaction and held a security interest in the vehicle pursuant to the RISC (p. 47). The Bailment Agreement also provided for the ability of Defendant to charge Plaintiff for excessive use of or damage to the vehicle before it was repossessed (p. 40-41).

Sayre states baiting a customer with a contract to provide financing on terms it does not intend to fulfill, then switching the terms of the financing would not necessarily result in the dealership making more money because of the varying fees charged by different lending institutions based on the subprime credit risk which cannot arbitrarily be passed on to the consumer by raising the price (p. 75-78). He also explained that baiting and switching would not be practical with a prime credit customer because the customer could simply go to another dealership to get the more favorable terms (p.80-81). Plaintiff has offered no evidence or legal authority to challenge these statements.

Defendant presents uncontested evidence that at no time during the transaction with Plaintiff, or at any other time, has it self-financed the purchase of an automobile, that is, it has never acted as a creditor to finance the sale of one of its vehicles. Plaintiff has offered no evidence to contradict Defendant's stated practice of acting as a broker or agent to attempt to obtain financing from a third party at the request of the potential buyer and then to assign the RISC to that lender once financing is approved; that Defendant has

11

never been a "buy here, pay here" dealer of used cars (p.28-29, 57). The record also establishes that Defendant does not, and did not in Plaintiff's case, make the final decision about whether credit would be extended under the terms disclosed in the RISC. Moreover, Plaintiff has not provided evidence sufficient to contest that Defendant attempted to obtain financing at the terms originally disclosed, but because of the inability to document the total amount of income she disclosed in the Credit Application, MarkOne declined to extend credit on those terms. Plaintiff has raised a question however, about whether Defendant told her that the financing with MarkOne had been finalized at the time she took the car home.

The Court now discusses various documents that were involved in Plaintiff's attempt to purchase a used car from Defendant. In addition to the RISC and the Bailment Agreement, Plaintiff also executed several other documents, including an Agreement to Purchase (Doc. 29-1, pp. 1-4) and a Credit Application (Doc. 29-1, pp. 12-14). All of these documents were related to the proposed sale of the vehicle.

The Agreement to Purchase sets forth the basic terms upon which the vehicle will be sold: price, fees, taxes, trade-in allowance, any other costs and the total amount to be paid to complete the sale. It also states in three separate provisions that the buyer (Plaintiff) agrees to execute all documents required by the terms and conditions of payment and the "Selling Dealer and/or the financing institution" to complete the purchase under the terms set forth therein. The Agreement to Purchase contemplates that the Selling Dealer and the financing institution may not be the same party and may have need of different documents in order to finalize the transaction, and requires the potential buyer to execute all necessary documents to provide accurate information.

12

Plaintiff needed financing to purchase the vehicle under the terms set forth in the Agreement to Purchase, and so she executed a Credit Application, RISC, and Bailment Agreement, among other documents which are not part of the record. In her Credit Application, Plaintiff indicated a monthly income of $1800 in two different places and certified that such information was true, correct and complete.

Plaintiff agreed to pay for the vehicle in accordance with the terms set forth in the RISC. It contained the disclosures required by the TILA such as the annual percentage rate, finance charge, amount financed, and total of payments, as well as the monthly payment amount and number of payments. It sets forth the terms of financing. Plaintiff does not contest the accuracy of the required disclosures.

The RISC also contains a merger clause which states: "[t]his contract is the entire agreement between you and us **relating to this contract**. Any change to this contract must be in writing and we must sign it (emphasis added)." The merger clause does not by its terms preclude consideration of another written document that may supercede its terms or any document or agreement related to the transaction that goes beyond the terms of financing set forth therein.

The RISC indicates it will be assigned to MarkOne Financial without recourse. That means that if MarkOne had accepted the assignment of the RISC, and Plaintiff defaulted on the payment terms, MarkOne could not look to Defendant to fulfill any portion of her payment obligations. Sayre Depo.,Doc. 29-1, 57-84 at pp. 44-45. This is further evidence that Defendant had no intention to act as a creditor to finance the vehicle.

The Bailment Agreement's first sentence indicates that it is attached to and forms part of the RISC. It goes on to say that pending Buyer's credit approval by the financing

13

institution and completion of the sales transaction, delivery of the vehicle is made as a convenience to the Buyer. It provides that untrue or incorrect statements in the loan application documents are a basis to rescind the sale and sets forth the Buyer's liability for damage, excessive wear and/or excessive mileage in the event of rescission.[7]

While the RISC includes a merger clause, the Court is of the opinion that to ignore all of the other documents Plaintiff executed in conjunction with her attempted purchase of the vehicle as non-existent and wholly without legal binding effect, as Plaintiff urges, cannot be done based on the language of those documents and on the facts of this case. Common sense dictates, and Florida law supports, that all of these documents should be read together as part of a single transaction. See, e.g., Dodge City, Inc., v. Byrne, 693 So.2d 1033 (Fla. 2d D.C.A. 1997)(involving spot delivery procedure).

Plaintiff offers an expert opinion regarding automobile sales and financing[8] in support of her allegations. Plaintiff's expert contends that Defendant is a creditor and must certify itself as such in order to gain access to potential customers' credit reports, and that Defendant likely did not intend to honor the original RISC provided to Plaintiff and used spot delivery not for her convenience, but to take her out of the car-buying market so it then could substitute new financing terms more favorable to Defendant and require her to accept them in order to keep the car.

Plaintiff's expert bases his conclusions on a review of six documents, including the RISC, Agreement to Purchase, Bailment Agreement and Plaintiff's credit report, plus

---

[7]    The two versions of the Bailment Agreement that Plaintiff signed differ in how excess mileage is defined (in excess of twenty miles per day versus twenty-five miles) and the rate to be charged per excess mile ($.12 versus $1.00). Other terms utilize somewhat different language but are substantially similar.

[8]    It is found in an Affidavit (Doc. 36-2).

14

Plaintiff's notes (which are not a part of the record). It does not appear that the Plaintiff's expert reviewed Plaintiff's, Sayre's, or Newmark's depositions or her credit Application, and it is unclear what if any other evidence or legal authority he reviewed in forming his conclusions. In other words, based on a review of various documents related to the transaction alone, Plaintiff's expert concludes that Plaintiff's legal theory of the case is correct.

The conclusory opinions of Plaintiff's expert relating to Defendant's "bait and switch" practices do not appear to consider the testimony of Sayre and Newmark that 1) Defendant does not itself extend credit for its sales transactions, 2) that it was Plaintiff's failure to provide adequate documentation to support the full amount of income she declared on her Credit Application that was the cause of the transaction not being financed pursuant to the terms in the original RISC and was the reason alternative financing was sought in her case, or 3) that the dealership would not necessarily profit financially from any switch in financing terms. Plaintiff herself has offered no evidence to contest these reasons given for the inability to finance the transaction as originally proposed. That is, she has not established that it was possible to complete the transaction based on the information she had provided. She simply contends that she believed financing had already been finally approved when she took the car home.

For the reasons discussed above, the entirety of the evidence in the record simply does not support the conclusions reached by Plaintiff's expert, and as the Court will discuss below, nor are they supported by relevant legal authority. Therefore, those

15

opinions do not raise genuine questions of material fact sufficient to preclude summary judgment.[9]

To summarize, on the record before it, the Court finds that there are no questions of material fact to support several of the conclusions the Court must reach in order to find that Defendant violated federal and state law as set forth in all counts of her Amended Complaint except Count VI (FDUTPA) which the Court addresses below. The Court finds the record evidence cannot support the following conclusions which form the basis for those causes of action: 1) because of its merger clause, the RISC is the only viable or relevant document in the entire transaction; 2) Defendant was in fact or should be deemed a creditor because it is referred to as Seller-Creditor in the RISC or because it obtained credit reports to determine which third party creditor might accept assignment of the RISC; 3) Defendant made the final decision not to extend credit under the terms of the original RISC; 4) the transaction could have been completed on the terms of the original RISC based upon the income Plaintiff documented; and 5) Defendant never intended to extend credit or assign the RISC under the original proposed terms because it stood to gain financially by switching financing terms. However, the Court also finds that a genuine issue

---

[9]     Plaintiff's expert's conclusions also are somewhat contradictory in that he states that Defendant "as the creditor-seller" does not obtain consumer credit reports for the purpose of extending credit" but "to determine which potential assignee [third party lender] is likely to buy the RISC as written." Doc. 36-2 ar ¶¶ 5 (a) & (b). Later he states that Defendant certifies itself to credit reporting agencies as a creditor for the purpose of extending credit. Doc. 36-2 at 3-4. Neither Plaintiff nor her expert assert that Defendant improperly obtains credit reports if it intends to act only as a broker or agent to obtain financing. Plaintiff's expert does not address the uncontested fact that Defendant never has extended credit. Plaintiff has provided no legal authority to support a conclusion that Defendant obtained credit reports impermissibly for its use in determining which potential third party creditor to approach.

     Plaintiff's supplemental authority (Doc. 55) is not persuasive. It concerns the Federal Trade Commissions's Privacy Rule and Auto Dealers and is addressed to car dealers who extend credit, as well as to those who arrange for someone to finance or lease a car. The provision cited by Plaintiff does not address a conditional sale/spot delivery transaction.

16

of material fact does exist in regard to whether Plaintiff was told that the transaction was final because financing from MarkOne had been finally approved at the time she took possession of the vehicle.

Legal Analysis

The Court now discusses Plaintiff's claims and the record before the Court in light of pertinent legal authority. The Court first addresses Plaintiff's claim under the FDUTPA, then her remaining claims.

"A claim under FDUTPA has three elements: 1) a deceptive or unfair practice; 2) causation; and 3) actual damages." Siever v. BWGaskets, Inc., 669 F.Supp.2d 1286, 1292 (M.D. Fla. 2009)(citations omitted). "Whether particular conduct constitutes such an unfair or deceptive trade practice is a question of fact." Id. at 1293. Such claim may arise out of a single contract, out of the business relationship between the parties, if the conduct is unfair or deceptive. Id.

The Court finds that a question of fact remains in this case as to whether Defendant engaged in an unfair or deceptive trade practice with regard to the transaction with Plaintiff. Although no question of fact exists that Plaintiff knew financing for the vehicle would be provided by a third party, and not by Defendant, it is unclear from the record whether she was told the transaction was final when she took possession of the vehicle. That is, a question of fact remains whether Defendant explained to Plaintiff the significance of the Bailment Agreement that final approval for financing had not been obtained and that if it could not be obtained, Defendant had the option to rescind the RISC whereby she would be required to return the vehicle subject to charges for damages or excessive mileage or to renegotiate the transaction on different financing terms.

17

The record also establishes that after Defendant rescinded the RISC and repossessed the vehicle, it did not return her trade-in vehicle or her deposit. There is no indication in the record of any charges for damage or excessive mileage Defendant may have been able to claim pursuant to the Bailment Agreement. The Court thus finds that Defendant is not entitled to summary judgment as to Count VI of Plaintiff's Amended Complaint.

Plaintiff's remaining claims (TILA, FMVRSFA, ECOA, UCC and unconstitutionality) are based upon the factual premise that Defendant never intended to extend or arrange for credit on the terms disclosed in the initial RISC (its intent to bait and switch in this transaction and in every similar transaction) and that conditional sales/spot delivery practices utilizing a Bailment Agreement violate state and federal law because 1) the contingent nature of the sale gives the car dealer the unilateral right to rescind the RISC so it should be deemed a creditor, and 2) the disclosed financing terms thereby are rendered illusory and amount to an impermissible waiver of her right to receive required disclosures. Plaintiff's claims require a finding that once a car dealer issues a RISC it becomes the legal creditor obligated to provide financing on the terms disclosed, that is, that any sale purported to be contingent upon final approval of financing is illegal.

As discussed above, the undisputed facts in this case do not establish that Defendant's intent was to bait and switch financing terms, or that it necessarily would have profited in any way from doing so. Plaintiff has offered no evidence to contradict Defendant's assertion that the reason it was unable to obtain financing on the disclosed terms was the inability to document the full amount of Plaintiff's income she claimed in her Credit Application.

18

Moreover, persuasive case law does not support invalidating conditional sale/spot delivery practices as a general rule. Numerous cases involving claims similar to Plaintiff's have found no violation of state or federal law by utilization of conditional sale/spot delivery practices as a matter of law.[10]

Even though TILA disclosures must be made when the consumer becomes contractually obligated to a credit agreement (RISC), when the deal is consummated, that obligation may not arise because Florida law permits parties to condition the formation of a contract on the occurrence of a subsequent event. Bragg v. Bill Heard Cheverolet, Inc.-Plant City, 374 F.3d 1060, 1065-1067 (11th Cir. 2004)(citations omitted). Florida law permits multiple documents regarding the same subject matter or transaction executed at or near the same time to be construed together as a single contract, so the financing terms disclosed by the RISC may be made subject to final approval. See, Id. at 1067 (citations omitted).

Nothing in the TILA prohibits financing contingencies, and accurate TILA disclosures may be rendered moot due to a subsequent failure of financing. See e.g. Janikowski v. Lynch Ford, Inc., 210 F.3d 765 (7th Cir. 2000), Scroggins v. LTD, Inc., 251 F.Supp.2d 1277 (E.D. Va. 2003);Chastain v. N.S.S. Acquisition Corp., No. 08-81260-CIV, 2009 WL 1971621 at *4 (S.D.Fla. July 8, 2009), and cases cited therein.

The Court finds no basis in fact or law to conclude that the financing terms disclosed to Plaintiff in the RISC were illusory or meaningless and not complete in the essential

---

[10]    Plaintiff's supplemental authority acknowledges that most courts addressing conditional sale/spot delivery practices have found that the failure to obtain financing may permit cancellation of the RISC and does not violate the TILA or other similar statutes cited by Plaintiff. Doc. 57-2 at p. 4.

provisions required under the TILA and the FMVRSFA, or that the Bailment Agreement constituted any waiver of her rights under these laws. Defendant thus is entitled to summary judgment on Counts I through III of Plaintiff's Amended Complaint.

Plaintiff's ECOA claim likewise cannot be sustained because Defendant was not a creditor that regularly participates in the credit decision required to provide Plaintiff with a notice of adverse action. "Where an automobile dealer plays a limited role of accepting and referring applications for credit, without participation in the credit decision" the dealer is not a creditor charged with the duty of advising the credit applicant of the reasons for the adverse credit action where at least one lender is given the opportunity whether to extend credit. See, e.g., Treadway v. Gateway Chevrolet Oldsmobile, Inc., 362 F.3d 971 (7th Cir. 2004).

The record is uncontroverted that Defendant does not finance its car sales, but acts as an agent or broker to obtain financing from third parties and the sale to Plaintiff was conditioned upon Defendant's ability to obtain financing from a third party and assign the RISC to that party. Moreover, MarkOne made the decision not to finance the transaction under the terms of the RISC based upon its inability to verify the income she reported in her Credit Application and provided Plaintiff with the required adverse action notice. Defendant therefore is entitled to summary judgment as to Count IV of Plaintiff's Amended Complaint.

Plaintiff's claim that Defendant violated the Florida UCC in repossessing the vehicle depends on a determination that Defendant was a secured creditor. As the Court has explained, Defendant factually and legally cannot be found to be a creditor on the facts of this case. In addition, Defendant had the right and did repossess the vehicle under the

20

terms of the Bailment Agreement when it could not obtain financing for the vehicle from a third party. As a result, Defendant is entitled to summary judgment as to Count V of Plaintiff's Amended Complaint.

In Count VII, Plaintiff asserts that two Florida statutes permitting conditional sales/spot delivery violate the United States Constitution because they result in violations of the TILA and ECOA, for example, as set forth in Plaintiff's Amended Complaint. For the reasons stated herein, the Court is of the opinion that neither the facts on the record nor legal authority support such conclusion. As a result, Defendant is entitled to summary judgment as to Count VII as well.

In conclusion, the record before the Court does not support a factual finding that a bait and switch occurred in this case, nor does the preponderance of persuasive legal authority cited support invalidating conditional sale/spot delivery transactions as a general rule. For the foregoing reasons, it is

**ORDERED AND ADJUDGED:**

1. That Defendant's Amended Motion for Final Summary Judgment (Doc. 29) is granted in part and denied in part as follows: summary judgment is granted in favor of Defendant as to Counts I through V, and VII of Plaintiff's Amended Complaint and denied as to Count VI ; and

2. That Plaintiff's Motion for Partial Summary Judgment (Doc. 41) is denied.

**DONE AND ORDERED** this ___22nd___ day of February 2012.

Howell W. Melton

Senior United States District Judge

Copies to:   Counsel of Record

            Hon. Pam Bondi
            Florida Attorney General